**UTE DISTRIBUTION CORPORATION, a Utah Corporation, Plaintiff,**

v.

**SECRETARY OF the INTERIOR OF the UNITED STATES, in His Official Capacity; and His Agents and Employees and Those Working in Concert With Him, and the Ute Indian Tribe, Defendants.**

Civil No. 95–C–376 W.

United States District Court,
D. Utah,
Central Division.

July 26, 1996.

Max D. Wheeler and Camille N. Johnson, Snow, Christensen & Martineau, Salt Lake City, UT, for Plaintiff.

Robert S. Thompson, III, Sandra Hansen, Fort Duchese, UT, John R. Lehmer, D'Elia & Lehmer, Park City, UT, for Defendant Ute Indian Tribe.

Stephen Roth, Asst. U.S. Attorney, Salt Lake City, UT, William R. McConkie, U.S. Dept. of the Interior, Salt Lake City, UT, for Defendant Secretary of the Interior.

Marc T. Wangsgard, Williams & Hunt, Salt Lake City, UT.

MEMORANDUM DECISION AND OR-
DER DENYING DEFENDANT UTE
INDIAN TRIBE'S MOTION TO DIS-
MISS

WINDER, Chief Judge.

This matter is before the court on Defendant Ute Indian Tribe's Motion to Dismiss pursuant to Fed.R.Civ.P. 12(b) which was argued on June 5, 1996. At the hearing, plaintiff Ute Distribution Corporation was represented by Max D. Wheeler and Camille N. Johnson, defendant Ute Indian Tribe was represented by Robert S. Thompson, III and John R. Lehmer, and defendant Secretary of the Interior of the United States was repre- sented by Stephen Roth and William R. McConkie. The court has carefully consid- ered all pleadings, memoranda, and other materials submitted by the parties. The

court has further considered the law and facts relevant to the defendant's motion. Now being fully advised, the court enters the following memorandum decision and order.

## I. *BACKGROUND*

From the late 1940s until about 1961, Congress pursued a federal Indian policy of terminating or reducing the federal supervision of several Indian tribes. Felix S. Cohen, *Handbook of Federal Indian Law* 170–80 (Rennard Strickland et al. eds, 1982 ed.). Intended to reduce federal involvement in tribal affairs, termination legislation also sought to assimilate Indians into the majority society, and provided for the distribution of land and tribal assets among the individual members of terminated tribes. David H. Getches et al., *Cases and Materials on Federal Indian Law* 229–37 (3d ed. 1993).

In 1954, Congress passed legislation terminating a number of Indian tribes,[1] including the mixed-blood Utes of the Uintah and Ouray Reservation in Utah ("Ute Indian Tribe" or "the Tribe"). Act of Aug. 27, 1954, ch. 1009, 68 Stat. 868 (the "Ute Partition Act" or "UPA") (codified as amended at 25 U.S.C. §§ 677–677aa). Unlike legislation terminating other tribes or bands, *see, e.g.,* Act of June 17, 1954, ch. 303, 68 Stat. 250 (repealed 1973) (terminating the Menominee Tribe of Wisconsin), *but see* 25 U.S.C. § 564d(a)(2) (giving individual members of Klamath Tribe option to withdraw from tribe and be paid for interest in tribal property), the Ute Partition Act did not terminate the federal Indian status of the entire Ute Indian Tribe but instead divided the tribe into two groups: mixed-bloods and full-bloods, and terminated federal supervision only as to the mixed-blood members. 25 U.S.C. § 677. A "full-blood" is defined as "a member of the tribe who possesses one-half degree of Ute Indian blood and a total of Indian blood in excess of one-half." *Id.* § 677a(b). "Mixed-blood" is defined to encompass "member[s] of the tribe who [do] not possess sufficient Indian or Ute Indian blood to fall within the full-blood class ... and those [full-bloods] who

become mixed-bloods by choice under the provisions of [the UPA]." *Id.* § 677a(c).

In 1956, the Secretary of the Interior published, pursuant to 25 U.S.C. § 677g, final rolls listing 1,314 full-blood members of the Ute Tribe (72.84%) and 490 mixed-blood members (27.16%). The UPA provided that upon publication of the final membership rolls, "the tribe shall thereafter consist exclusively of full-blood members. Mixed-blood members shall have no interest therein except as otherwise provided in [the UPA]." 25 U.S.C. § 677d. Following the publication of the rolls, tribal assets "then susceptible to equitable and practicable distribution" were partitioned, according to the relative number of each group as reflected in the final membership rolls, by the Tribal Business Committee representing the full-bloods and the authorized representatives of the mixed-bloods. *Id.* § 677i. Tribal assets are defined by the UPA to include "any property of the tribe, real, personal or mixed, whether held by the tribe or by the United States in trust for the tribe." *Id.* § 677a(f). Approximately 27.16 percent of the divisible assets susceptible to equitable and practicable distribution, e.g., land and trust funds, were then distributed to individual mixed-blood members and federal supervision of the mixed-bloods and their individually held property was terminated. *See id.* § 677o. The Tribe retained a beneficial interest in the remaining 72.84% of the divisible assets and continued its trust relationship with the United States.

The Ute Partition Act further provided that indivisible tribal assets were to remain in government trust: "All unadjudicated or unliquidated claims against the United States, all gas, oil, and mineral rights of every kind, and all assets not susceptible to equitable and practicable distribution shall be managed jointly by the Tribal Business Committee and the authorized representatives of the mixed-blood group." *Id.* § 677i. The Secretary of the Interior continues to maintain a supervisory role over the joint management of indivisible tribal assets, even

---

1. For a list of terminated tribes, see Cohen, supra, at 173–74 & nn. 224–37. Beginning in the early 1970s, Congress repealed some of the termination legislation, restoring tribes' federal status. *See id.* at 186–87.

though the individual mixed-bloods' tribal and federal Indian status has been terminated with respect to all other assets and rights.

In 1956, the mixed-bloods organized the Affiliated Ute Citizens ("AUC") as an unincorporated association to act as their representative pursuant to 25 U.S.C. § 677e, and empowered its board of directors to delegate to one or more corporations the authority to manage the mixed-bloods' assets. *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 135–36, 92 S.Ct. 1456, 1463–64, 31 L.Ed.2d 741 (1972). Such authority was delegated to the Ute Distribution Corporation ("UDC") upon its incorporation in 1958 with the stated purpose

> to manage jointly with the Tribal Business Committee of the full-blood members of the Ute Indian Tribe ... all unadjudicated or unliquidated claims against the United States, all gas, oil and mineral rights of every kind, and all other assets not susceptible to equitable and practicable distribution to which the mixed-blood members of the said tribe ... are now, or may hereafter become entitled ... and to receive the proceeds therefrom and to distribute the same to the stockholders of th[e] corporation.

*Id.* at 136, 92 S.Ct. at 1463 (quoting Articles of Incorporation of UDC, art. IV). In 1959, by resolution, the AUC permanently delegated to the UDC the authority to manage the mixed-bloods' share of indivisible tribal assets. *Id.* The UDC issued ten shares of capital stock to each mixed-blood Ute, a total of 4900 shares. UDC stockholders share in 27.16% of the proceeds from the indivisible assets, such as lease payments for gas, oil, and mineral rights.

This lawsuit, brought by the Ute Distribution Corporation on April 24, 1995, seeks a declaratory judgment pursuant to 28 U.S.C. § 2201 that certain tribal water rights were not partitioned; that they remain in trust for the benefit of mixed-blood and full-blood members of the Tribe; and that they are subject to joint management by the UDC and the Tribal Business Committee under the supervision of the Secretary of the Interior. Defendant Ute Indian Tribe filed a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(1) & 12(b)(7). The Tribe asserts that it has sovereign immunity from suit and has not waived its immunity by consenting to be sued; that it is a necessary and indispensable party to this lawsuit under Fed.R.Civ.P. 19 and as such its immunity from suit requires the dismissal of this action; that the rules of comity require this action first be heard in tribal court; and that any applicable statute of limitations has run, barring this action.

## II. STANDARD OF REVIEW

■ A motion to dismiss pursuant to Federal Rule 12(b)(1) is a motion to dismiss for lack of subject matter jurisdiction. In such a motion, Plaintiff has the burden of establishing jurisdiction. *Penteco Corp. v. Union Gas Sys., Inc.,* 929 F.2d 1519, 1521 (10th Cir.1991). " 'A court lacking jurisdiction cannot render judgment but must dismiss the cause *at any stage* of the proceedings in which it becomes apparent that jurisdiction is lacking.' " *Tuck v. United Servs. Auto. Ass'n,* 859 F.2d 842, 844 (10th Cir.1988) (quoting *Basso v. Utah Power & Light Co.,* 495 F.2d 906, 909 (10th Cir.1974), *cert. denied,* 489 U.S. 1080, 109 S.Ct. 1534, 103 L.Ed.2d 839 (1989)). "Whether the federal district court ha[s] jurisdiction of the action must be determined from the allegations of fact in the complaint, without regard to mere conclusory allegations of jurisdiction." *Groundhog v. Keeler,* 442 F.2d 674, 677 (10th Cir.1971).

■ A motion to dismiss pursuant to Rule 12(b)(7) is a motion to dismiss for failure to join a party under Rule 19. "The proponent of a motion to dismiss under 12(b)(7) has the burden of producing evidence showing the nature of the interest possessed by an absent party and that the protection of that interest will be impaired by the absence." *Citizen Band Potawatomi Indian Tribe v. Collier,* 17 F.3d 1292, 1293 (10th Cir.1994). "The proponent's burden can be satisfied by providing 'affidavits of persons having knowledge of these interests as well as other relevant extra-pleading evidence.' " *Id.* (quoting *Martin v. Local 147, Int'l Bhd. of Painters,* 775 F.Supp. 235, 236–37 (N.D.Ill.1991)).

## III. *DISCUSSION*

### A. Tribal Sovereign Immunity

Defendant Ute Indian Tribe argues that it must be dismissed from this action because as a sovereign entity it may not be sued without its consent. The Tribe asserts it has not consented to this suit, nor has Congress or the Tribe itself otherwise waived the Tribe's sovereign immunity from suit. The UDC, on the other hand, contends that Congress limited the Tribe's sovereign immunity with respect to the adjudication of issues concerning the joint management of indivisible assets under the Ute Partition Act. This court agrees.

■ Courts have long recognized the sovereign status of Indian tribes. They "are 'distinct, independent political communities, retaining their original natural rights' in matters of local self-government." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55, 98 S.Ct. 1670, 1675, 56 L.Ed.2d 106 (1978) (quoting *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 559, 8 L.Ed. 483 (1832)). "Although no longer 'possessed of the full attributes of sovereignty,' they remain a 'separate people, with the power of regulating their internal and social relations.'" *Id.* (quoting *United States v. Kagama*, 118 U.S. 375, 381–82, 6 S.Ct. 1109, 1112–13, 30 L.Ed. 228 (1886)). As such, Indian tribes possess "the common-law immunity from suit traditionally enjoyed by sovereign powers." *Id.* at 58, 98 S.Ct. at 1677. Tribal sovereign immunity is, however, subject to Congress's plenary power over Indian affairs which includes the power to waive tribal sovereign immunity. While Congress may exercise such power, the Supreme Court has observed that "[i]t is settled that a waiver of sovereign immunity cannot be implied but must be unequivocally expressed." *Id.* (citations omitted).

■ The Ute Tribe contends that the Ute Partition Act is devoid of any express language limiting or waiving the Tribe's sovereign immunity, and that the Tribe therefore cannot be made a party to this action. In support of its position, the Tribe cites a number of cases holding Indian tribes immune from suit, including *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 72, 98 S.Ct. 1670, 1684, 56 L.Ed.2d 106 (1978) (upholding tribal sovereign immunity from federal suit involving alleged violation of Indian Civil Rights Act ("ICRA")); *Bank of Oklahoma v. Muscogee (Creek) Nation*, 972 F.2d 1166, 1171 (10th Cir.1992) (upholding sovereign immunity from suit in federal interpleader action and related cross-claim); *Nero v. Cherokee Nation*, 892 F.2d 1457, 1461 (10th Cir.1989) (finding provision of ICRA does not waive tribal sovereign immunity); *Enterprise Management Consultants, Inc. v. United States ex rel. Hodel*, 883 F.2d 890, 892 (10th Cir. 1989) (finding sovereign immunity a bar to federal court's consideration of plaintiff's prayer for injunctive and declaratory relief in contract dispute); *State of Oklahoma ex rel. Oklahoma Tax Comm'n v. Graham*, 822 F.2d 951, 956 (10th Cir.1987) (affirming dismissal on basis of sovereign immunity of state's suit against tribe for failure to pay state taxes); *White v. Pueblo of San Juan*, 728 F.2d 1307, 1313 (10th Cir.1984) (finding tribal sovereign immunity from suit in ICRA action). None of the case law relied on by the Tribe, however, is controlling in the instant action.

No case cited by the Tribe as supporting its assertion of sovereign immunity involves the Ute Partition Act. The only federal statute examined in the cited cases is the Indian Civil Rights Act of 1968, 25 U.S.C. §§ 1301–1303 ("ICRA"). *See, e.g., Santa Clara Pueblo*, 436 U.S. 49, 98 S.Ct. 1670. The ICRA provides members of Indian tribes with protection against tribal authority similar, but not identical, to the constitutional guarantees of the Bill of Rights and the Fourteenth Amendment. *See* 25 U.S.C. § 1302. Thus, ICRA actions often arise from the relationships between tribes and their members or other individuals, and from internal matters that historically are within the scope of sovereign self-government.

For example, in *Santa Clara Pueblo*, the Supreme Court found the defendant tribe immune from an equal protection suit brought under the ICRA by a female tribe member seeking declaratory and injunctive relief against enforcement of a tribal ordinance denying membership to the children of female members who marry non-members, while granting membership to the children of

male members who marry outside the tribe. *Santa Clara Pueblo,* 436 U.S. at 59, 98 S.Ct. at 1677. Similarly, in *Nero v. Cherokee Nation* the Tenth Circuit Court of Appeals found that sovereign immunity barred the district court's consideration of the plaintiffs' claim that the tribal defendants violated their rights under the ICRA by denying them tribal membership. 892 F.2d at 1460, 1461. In *White v. Pueblo of San Juan,* 728 F.2d 1307 (10th Cir.1984), the Tenth Circuit held that tribal sovereign immunity barred a suit brought pursuant to the ICRA's takings clause by non-Indians for damages related to their sale of land located within the reservation boundaries. *Id.* at 1313. The court in *White* upheld the trial court's dismissal, in part because the plaintiffs failed to exhaust tribal remedies as required by an earlier Tenth Circuit decision finding a narrow exception to sovereign immunity in cases brought under the ICRA by non-Indians where there is an "absolute necessity" of federal adjudication. *See id.* at 1309–12 (discussing *Dry Creek Lodge, Inc. v. Arapahoe and Shoshone Tribes,* 623 F.2d 682 (10th Cir.1980), *cert. denied,* 449 U.S. 1118, 101 S.Ct. 931, 66 L.Ed.2d 847 (1981)).

The context of the Ute Partition Act is quite different from that of the ICRA. The ICRA defines the rights of individuals in relation to tribal authority, and disputes may properly be adjudicated in tribal forums. *See Santa Clara Pueblo,* 436 U.S. at 65, 98 S.Ct. at 1680–81. Further, while remaining silent as to federal causes of action under any of its other provisions, the ICRA specifically allows a person to seek a writ of habeas corpus in federal court "to test the legality of his detention by order of an Indian tribe," thus indicating that by omission Congress chose not to waive tribal sovereign immunity with respect to the enforcement of any other right protected under the ICRA. 25 U.S.C. § 1303; *see Santa Clara Pueblo,* 436 U.S. at 70, 98 S.Ct. at 1683. Conversely, the UPA does not lend itself to tribal adjudication, nor is there any evidence of congressional intent to limit a plaintiff's cause of action. In fact, it could not have been the intent of Congress to require the mixed-bloods' representative to seek vindication in a tribal forum of its rights regarding assets held in trust by the United States for the benefit of the Tribe and the mixed-blood group, when the UPA expressly calls for the joint management of the assets under the supervision of the Secretary of the Interior.

Other cases cited by the Tribe have found tribal sovereign immunity from suit by States or State entities. *E.g., Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe,* 498 U.S. 505, 513–14, 111 S.Ct. 905, 911–12, 112 L.Ed.2d 1112 (1991) (finding State may not tax tribal sales of goods to tribe members); *State of Oklahoma ex rel. Oklahoma Tax Comm'n v. Graham,* 822 F.2d 951, 956 (10th Cir.1987) (similar); none are directly applicable here.

Still other cases upholding tribal immunity have concerned commercial or financial relationships between tribes and non-Indian parties. For instance, in *Bank of Oklahoma,* the Tenth Circuit found that tribal sovereign immunity barred the federal district court's consideration of an interpleader action and a cross-claim brought against the Muscogee Nation ("Nation"). The court rejected the plaintiff bank's policy argument that "commercial relations between Indian tribes and banks will be chilled" if sovereign immunity is not waived, "declin[ing] the [plaintiff's] invitation to second-guess the wisdom of the Nation's business decisions under the guise of judicial review." 972 F.2d at 1169. In another case, the Tenth Circuit upheld the district court's dismissal on the basis of sovereign immunity of a suit brought by a non-Indian contractor against the Potawatomi Tribe. *Enterprise Management Consultants,* 883 F.2d at 892. There, the contractor sought the federal approval and enforcement of two bingo management contracts it had with the Tribe. *Id.* The court refused to waive tribal sovereign immunity in the absence of the "highly unusual circumstances" under which the Tenth Circuit had found an exception to tribal immunity under the ICRA in *Dry Creek Lodge, Inc. v. Arapahoe & Shoshone Tribes,* 623 F.2d 682 (10th Cir. 1980). *Enterprise Management Consultants,* 883 F.2d at 892.

The relationship between the Tribe and the UDC stands in stark contrast to the

commercial relationships in the cases cited by the Tribe in support of its claim of sovereign immunity. Unlike the plaintiffs in *Bank of Oklahoma* and *Enterprise Management Consultants*, the mixed-bloods and their representative, the UDC, cannot choose whether or not to conduct business with the Tribe and take the concomitant risk of having their choice of forums for resolution of disputes limited by sovereign immunity. *See Bank of Oklahoma*, 972 F.2d at 1169 (recognizing tribe's power of self-determination in conducting its commercial affairs). The UDC is required by statute to jointly manage shared assets with the Tribe and must maintain a business relationship with respect to those assets.

Thus, none of the cases recognizing Indian tribes' right of sovereign immunity has done so in the unique context of the Ute Partition Act.[2] In structuring a federal trust relationship with the Ute Tribe and the mixed-bloods in the management of indivisible assets not susceptible to equitable and practicable distribution, Congress waived the Ute Tribe's sovereign immunity with respect to suits concerning those assets.[3]

■ "Indian tribes are 'domestic dependent nations' that exercise inherent sovereign authority over their members and territories." *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 509, 111 S.Ct. 905, 909, 112 L.Ed.2d 1112 (1991) (quoting *Cherokee Nation v. Georgia*, 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831)). That authority includes the "power to make their own substantive law in internal matters . . ., and to enforce that law in their own forums." *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 55–56, 98 S.Ct. 1670, 1675–76, 56 L.Ed.2d 106 (1978) (citations omitted). The instant case, however, does not involve internal matters or issues concerning traditional

sovereign authority over members of the Tribe or territory belonging only to the Tribe. Instead, the dispute here deals with the clarification of rights created solely through congressional action, supervised by the federal government, and shared by the Tribe with a group of people whose status and rights are a product of federal law.

■ Although the Ute Partition Act lacks any language expressly authorizing a cause of action in federal court, the structure and purpose of the Act clearly divests the Tribe of some of its sovereign immunity from suit. First, the UPA set forth the procedure whereby the Tribe was divided into the full-blood and mixed-blood groups, and allowed the mixed-bloods to establish a representative organization and adopt a constitution. 25 U.S.C. §§ 677–677g. The UPA then provided for the Tribal Business Committee and the mixed-bloods' representatives to split up the tribe's divisible assets by agreement, subject to the approval of the Secretary of the Interior, *id.* § 677i, and for the mixed-bloods' portion of the divisible assets to then be distributed to individual mixed-bloods, with termination of federal supervision as to those assets. *Id.* § 677l.

Finally, as to those tribal assets not susceptible to equitable and practicable distribution, Congress mandated that they *"shall* be managed jointly by the Tribal Business Committee and the authorized representatives of the mixed-blood group, subject to such supervision by the Secretary as is otherwise required by law" with the net proceeds from the indivisible assets distributed proportionally to the two groups. *Id.* § 677i (emphasis added). *See also* 25 C.F.R. §§ 217.1–217.7 (1995) (administrative regulations for joint management of tribal assets). Thus, while Congress terminated federal supervision of the mixed-bloods with respect to partitioned

---

**2.** In the only other opinion to consider tribal sovereign immunity under the Ute Partition Act, Judge Jenkins of this court concluded that Congress limited the Ute Tribe's immunity when it passed the UPA. *Affiliated Ute Citizens v. Ute Indian Tribe*, No. 85–C–569J, mem. op. and order at 28 (D.Utah Feb. 3, 1987). Without addressing the merits of Judge Jenkins's ruling as to tribal sovereign immunity, the Tenth Circuit vacated it as moot, having upheld his dismissal

of the action for lack of standing. 22 F.3d 254, 255–56 (10th Cir.1994).

**3.** The legislative history of the Ute Partition Act indicates that the UPA "is the result of proposals initiated by the Ute Tribe," thus suggesting that the Tribe may have waived its own sovereign immunity with respect to jointly managed assets. *See* H.R.Rep. No. 2493, 83d Cong., 2d Sess. 67 (1954).

and distributed assets, and eliminated the mixed-bloods' federal Indian status in all other respects, it retained its trust relationship with the mixed-bloods as to the indivisible assets of the tribe. Such assets are therefore not under the traditional sovereign control of the Ute Tribe, but are held in trust by the Government for the benefit of both the Tribe and the Ute Distribution Corporation, who must jointly share the management responsibilities for the indivisible assets.

It therefore would be incongruous with the structure and intent of the UPA to conclude that the Ute Indian Tribe may assert sovereign immunity in actions brought to determine the status of, or rights in, assets held in trust by the United States for the benefit of both the Tribe and the mixed-bloods. Such a result would frustrate the purpose of the Act by effectively allowing the Tribe to exclude the mixed-bloods' representative, the UDC, from participating in the joint management of the indivisible assets, and would clearly run counter to the plain language of the UPA requiring that such assets "shall be managed jointly by the Tribal Business Committee and the [UDC]." 25 U.S.C. § 677i.

The Supreme Court has recognized that there may be a divestiture of tribal sovereign immunity "in cases where the exercise of tribal sovereignty would be inconsistent with the overriding interests of the National Government." *Washington v. Confederated Tribes of the Colville Indian Reservation*, 447 U.S. 134, 153–54, 100 S.Ct. 2069, 2081, 65 L.Ed.2d 10 (1980). This court believes that to allow the Ute Tribe to assert sovereign immunity in this action would contradict the overriding national interest of ensuring that federal trust property is managed in an orderly manner according to the joint scheme set forth by Congress in the UPA. Rather than to allow the Ute Tribe to unilaterally exclude the UDC from participating in the joint management of indivisible assets, this court finds that Congress waived the Tribe's sovereign immunity with respect to actions seeking to resolve issues concerning assets not susceptible to equitable and practicable distribution under the UPA.

▬ The UDC asserts that further support for a finding of waiver of sovereign

immunity is found in the Ute Indian Tribe's corporate charter's "sue and be sued" provision. The Ute Indian Tribe was chartered in 1938 as a federal corporation pursuant to section 17 of the Indian Reorganization Act, ch. 576, 48 Stat. 988 (1934) (codified at 25 U.S.C. § 477). The tribal corporation was chartered to exercise certain enumerated powers, and in order to further business activity with non-Indian parties the corporation included a provision in its charter allowing itself "[t]o sue and be sued in courts of competent jurisdiction within the United States." The corporate charter's "sue and be sued" provision serves as a waiver of immunity only as to the tribal corporation, not as to the tribal organization established pursuant to section 16 of the Indian Reorganization Act, ch. 576, 48 Stat. 987 (1934) (codified at 25 U.S.C. § 476). *Ramey Constr. Co. v. Apache Tribe*, 673 F.2d 315, 320 (10th Cir. 1982); *Kenai Oil & Gas, Inc. v. U.S. Dep't of the Interior*, 522 F.Supp. 521, 528–30 (D.Utah 1981), aff'd and remanded, 671 F.2d 383 (10th Cir.1982).

The UDC contends it is suing the Ute Indian Tribe as a federally chartered corporation and that the "sue and be sued" provision is therefore a waiver of sovereign immunity. The tribal defendant is named in the complaint, however, only as "The Ute Indian Tribe," without designation of corporate status. The charter does denote that the tribal corporation is chartered under the name "The Ute Indian Tribe"; however the tribal organization is also known as the Ute Indian Tribe, or as the Ute Indian Tribe of the Uintah and Ouray Reservation. Hence, it is at least facially ambiguous whether the tribal corporate entity is indeed a defendant in this case.

Whether the "sue and be sued" clause of the charter serves as a waiver of sovereign immunity depends on whether the Ute Tribe as constitutional organization or the Ute Tribe as federal corporation is the proper defendant here. The Ute Partition Act specifies that the Tribal Business Committee of the Tribe is to act as joint manager of the indivisible assets on behalf of the Tribe. The Tribal Business Committee was established under the constitution of the tribal organiza-

tion, and is authorized by charter to exercise all enumerated powers of the tribal corporation. At this stage of the litigation, it is unclear whether the Tribal Business Committee's exercise of its joint management function with respect to the indivisible assets is a corporate activity, or whether the Committee is acting on behalf of the tribal organization. The court will therefore defer a ruling on this question; however the court nonetheless finds a congressional waiver of the tribal organization's sovereign immunity in any event.

A federal court is the only proper forum for the clarification of rights under the Ute Partition Act and the resolution of such issues as whether certain water rights have been distributed or are indivisible and subject to joint management, or whether the Secretary of the Interior has failed properly to supervise the joint management of indivisible assets. This court finds the UPA to constitute an express waiver of the Ute Indian Tribe's sovereign immunity.

### B. Failure to Join Tribal Defendant

Defendant Ute Indian Tribe contends that as a sovereign entity it cannot be joined as a party to this action, that it is a necessary and indispensable party under Fed.R.Civ.P. 19(a) & (b), and that this action must therefore be dismissed. The plaintiff argues that even if the Ute Indian Tribe is immune from this suit, it is not an indispensable party because the United States, as trustee, can adequately protect the Tribe's legal interests and rights. Having determined that the Ute Indian Tribe's sovereign immunity is limited with respect to the Ute Partition Act and that it is a proper party to this action, there is no need for this court to consider the Tribe's argument for dismissal under Rule 19.

### C. Exhaustion of Tribal Court Remedies

■ The Ute Tribe asserts that principles of comity dictate that the Ute Distribution Corporation must first bring this action in tribal court before a federal court may properly assert jurisdiction. The court disagrees.

The Tribe cites *Iowa Mut. Ins. Co. v. LaPlante,* 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987), and *National Farmers*

*Union Ins. Cos. v. Crow Tribe of Indians,* 471 U.S. 845, 105 S.Ct. 2447, 85 L.Ed.2d 818 (1985), for the proposition that federal courts are required to defer to the tribal forum for a resolution of disputes over which a tribal court has jurisdiction and in which an Indian tribe is a defendant. The Tribe reads these cases too broadly. Both are distinguishable from the instant action for a number of reasons.

First, in both *LaPlante* and *National Farmers Union,* actions were already pending in tribal courts when the non-Indian parties filed suit in federal district court. In *National Farmers Union,* a tribe member brought a personal injury action in tribal court against a Montana school district, a subdivision of the State. After the tribal court entered a default judgment against the school district, the school district and its insurer filed a complaint in federal court invoking 28 U.S.C. § 1331 as a basis for jurisdiction. The school district and its insurer sought an injunction against execution of the tribal court judgment, asserting as a federal question whether the tribal court had proper subject matter jurisdiction over the tort action. 471 U.S. at 848–49, 105 S.Ct. at 2449–50. The Supreme Court ultimately held that "the question whether a tribal court has the power to exercise civil subject-matter jurisdiction over non-Indians" should be resolved first by the tribal court whose jurisdiction is challenged. *Id.* at 855, 105 S.Ct. at 2453.

In contrast, the instant case involves a federal question of a completely different nature. Here, the plaintiffs seek a declaratory judgment interpreting and clarifying the provisions of a piece of federal legislation, the Ute Partition Act. There has been no action filed in tribal court and therefore no challenge to tribal exercise of jurisdiction is before this court. As the Supreme Court noted in *LaPlante,* "the exhaustion rule enunciated in *National Farmers Union* did not deprive the federal courts of subject-matter jurisdiction. Exhaustion is required as a matter of comity, not as a jurisdictional prerequisite." 480 U.S. at 16 n. 8, 107 S.Ct. at 976 n. 8. Thus, *National Farmers Union* does not require this court to abstain from

exercising its proper jurisdiction in deciding a federal question where tribal jurisdiction is not at issue.

*LaPlante* dealt with a similar situation, where an insurance company filed a declaratory judgment action in federal court seeking a clarification of its responsibilities to insureds under a policy it issued them. *Id.* at 11–13, 107 S.Ct. at 973–75. The insurance company filed its federal diversity action after the insureds had already sued the insurance company in tribal court and the tribal court had rejected the insurance company's challenge of tribal jurisdiction. *Id.* at 12, 107 S.Ct. at 974. The *LaPlante* Court ruled that the insurance company must first exhaust its remedies in the tribal forum, including available tribal appellate review, before commencing an action in federal court seeking resolution of the same issue pending before the tribal court. *Id.* at 18–19, 107 S.Ct. at 977–78. Again, however, *LaPlante* is clearly distinguishable from the case before this court. In *LaPlante*, the non-Indian plaintiff asserted federal diversity jurisdiction under 28 U.S.C. § 1332, rather than federal question jurisdiction under 28 U.S.C. § 1331, as does the UDC here. In *LaPlante*, the same issue that the non-Indian plaintiff sought to have resolved by the federal district court was already before the tribal court; in the instant case, the tribal court has not been asked to consider the issue before this court, the interpretation and enforcement of the UPA.

Finally, this court has already concluded that it has subject matter jurisdiction over claims relating to those assets which were not susceptible to equitable and practicable distribution at the time of termination of the mixed-bloods, and that the tribal court lacks jurisdiction to consider such claims. Three judges of this court sitting en banc to consider common issues in related cases involving hunting and fishing rights under the Ute Partition Act (also referred to as "the Termination Act") found:

4. The Termination Act does not confer jurisdiction upon the tribal courts to clarify rights under the Termination Act, nor to enforce or determine the provisions and the consequences of the Termination Act.

5. This court has subject matter jurisdiction over matters concerning rights which are the subject of the Termination Act.

6. This court has subject matter jurisdiction over matters concerning the interpretation and enforcement of provisions and the consequences of the Termination Act.

*Affiliated Ute Citizens v. Ute Indian Tribe*, No. 85-C-569J (D.Utah Aug. 31, 1990); *Ute Distribution Corp. v. Ute Indian Tribe*, No. 89-C-959W (D.Utah Aug. 31, 1990); *Murdock v. Ute Indian Tribe*, No. 89-C-982G (D.Utah Aug. 31, 1990) (joint findings of fact, conclusions of law, and preliminary injunction issued by Jenkins, C.J., Winder & Greene, JJ.). Therefore, there is no reason why this court may not exercise its jurisdiction, pursuant to 28 U.S.C. §§ 1331 & 2201, and address the issues properly before it in this case.

### D. Statute of Limitations

The Ute Indian Tribe contends that this litigation is barred by any of a number of applicable statutes of limitation, either tribal, state, or federal, claiming that more than thirty years have passed since the UDC's cause of action accrued. The court rejects the Tribe's position and finds that this action is not barred by any statute of limitations.

 The Tribe proposes that either section 1–8–7(1) of the Ute Law and Order Code, requiring that "[a]ny action against the Tribe or its officers or employees arising from the performance of their official duties must be commenced within one year of the date the cause of action accrued," or section 1–8–7(2), requiring that "[a]ny other action must be commenced within three years of the date the cause of action accrued," is applicable and bars this litigation. However, this court has already determined that it, and not the Ute Tribal court, has jurisdiction over this matter. The Tribe has offered no authority or reason why the court should borrow a limitations period from the Ute Law and Order Code, and the court finds none.

 The Tribe also contends that a specific federal statute bars this action. Although it recognizes that a declaratory judgment is a procedural device, not cause of action unto itself, and that there is no gener-

al statute of limitations for actions seeking declaratory judgments, *see* 22A Am.Jur.2d *Declaratory Judgments* § 184 (1988), the Tribe argues that the court should apply the statute of limitations of an analogous federal statutory cause of action. The Tribe identifies 28 U.S.C. § 2409a(a), which provides a cause of action against the United States to adjudicate a disputed title to real property in which the United States claims an interest, as creating an analogous cause of action. However, that statutory provision expressly excludes actions seeking to adjudicate water rights or title disputes involving "trust or restricted Indian lands." *Id.* The court therefore declines to apply the twelve-year statute of limitations of 28 U.S.C. § 2409a(g). The court finds no other analogous federal cause of action providing a statute of limitations; the Ute Partition Act itself is silent as to any limitations period.

■ The court also declines to borrow a state statute of limitations. The Supreme Court, in *County of Oneida v. Oneida Indian Nation*, 470 U.S. 226, 105 S.Ct. 1245, 84 L.Ed.2d 169 (1985), found an exception to "the general rule ... that a state limitations period for an analogous cause of action is borrowed and applied to the federal claim" in a case involving Indian tribal land claims. *Id.* at 240–44, 105 S.Ct. at 1254–56. There, the Court determined that to borrow a state limitations period would be inconsistent with federal policy, *id.* at 241, 105 S.Ct. at 1255, noting "evidence of Congress' concern that the United States had failed to live up to its responsibilities as trustee for the Indians." *Id.* at 244, 105 S.Ct. at 1256 (discussing amendments to federal statute authorizing United States to bring suits in tort or contract for money damages on behalf of Indian tribes). *See also* 28 U.S.C. § 2415(c) ("Nothing herein shall be deemed to limit the time for bringing an action to establish the title to, or right of possession of, real or personal property."). This court finds that the same policy considerations apply here.

The Ute Tribe argues that the policy concerns underlying the Supreme Court's ruling in *Oneida Nation* are absent here because the mixed-bloods Utes are not Indians. The court disagrees. Although the Ute Partition Act terminated the mixed-bloods' federal status generally, and terminated federal supervision of divisible and distributed assets specifically, the UPA expressly provided for a continuing federal trust relationship with the mixed-bloods in the supervision of the mixed-bloods' joint management of indivisible assets with the Tribe. 25 U.S.C. § 677i. Thus, with respect to jointly managed assets "not susceptible to equitable and practicable distribution," the mixed-bloods retain their federal Indian status, and the same concerns about the United States' trust responsibility to protect valuable Indian property rights that guided the Supreme Court in *Oneida Nation* apply here as well. Hence, the court will not borrow an analogous state statute to bar the UDC's declaratory judgment action.

■ Finally, even were the court to identify an appropriate state or federal statute of limitations, there is no single, discrete event associated with the UPA that has given rise to a cause of action and triggered any attendant limitations period foreclosing this action. The Tribe asserts that a cause of action accrued to the UDC at various times, including when the UPA was enacted in 1954, when tribal assets were partitioned in 1961, or when the United States, the Tribe, and the Central Utah Conservancy District entered into an agreement in 1965 relating to the use and development of Indian water rights. However, if this court were to conclude that certain tribal water rights were not partitioned and are an indivisible asset, then the Ute Tribe and the Secretary of the Interior would each be found to have an ongoing duty to ensure the UDC was properly included at all times in the joint management of that asset. Thus, any breach at any time of the continuing responsibility of the Secretary or the Tribe could trigger a cause of action; hence, a declaratory judgment defining a party's rights under the UPA may properly be sought at any time while the federally supervised joint management scheme is in effect.

For the foregoing reasons, and good cause appearing, IT IS HEREBY ORDERED that

the Ute Indian Tribe's Motion to Dismiss is DENIED.