FILED
United States Court of Appeals
Tenth Circuit

October 19, 2009

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UTE DISTRIBUTION
CORPORATION,

      Plaintiff-Appellant,

RED ROCK CORPORATION, a Utah
corporation,

      Plaintiff-Intervenor,

v.

SECRETARY OF THE INTERIOR OF
THE UNITED STATES, in his official
capacity; UTE INDIAN TRIBE,

      Defendants-Appellees.

No. 08-4147

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 2:95-CV-0376-DB)

---

Shawn E. Draney, (Max D. Wheeler, Camille N. Johnson, and Judith D. Wolferts
with him on the briefs), of Snow, Christensen & Martineau, Salt Lake City, Utah,
for Plaintiff-Appellant.

Katherine J. Barton, United States Department of Justice, Environment and
Natural Resource Division, Washington, D.C. (John C. Cruden, Acting Assistant
Attorney General; John K. Mangum, Assistant United States Attorney, Salt Lake
City Utah; Elizabeth A. Peterson, United States Department of Justice,
Environment and Natural Resources Division, Washington, D.C.; Jason Hartz,
Office of the Solicitor, United States Department of the Interior, Washington,

D.C., of counsel, with her on the brief), for Defendant-Appellee Secretary of the Interior.

Tod J. Smith of Whiteing & Smith, Boulder, Colorado, for Defendant-Appellee Ute Indian Tribe.

---

Before **HENRY,** Chief Circuit Judge, **BRISCOE,** and **LUCERO**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

Plaintiff Ute Distribution Corporation (UDC) appeals from a decision of the district court denying UDC's claim for a declaration that the Secretary's implementation of the 1954 Ute Partition and Termination Act, 25 U.S.C. §§ 677 et seq., did not provide for an equitable and practicable division and distribution of water rights between the "mixed-blood" and "full-blood" members of the Ute Indian Tribe, and that, consequently, such rights are currently held in trust by the Secretary for the mixed-blood members.[1] Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we conclude that UDC's action was untimely filed. Accordingly, we affirm the district court's dismissal of UDC's claim and remand only so that the district court may amend its judgment to reflect this as the basis for the judgment.

---

[1] The legislation at issue, the parties, and the court below used the terms "mixed blood" and "full blood." We repeat those terms solely for consistency.

I

*Factual background*

Between 1953 and the mid-1960's, a period commonly referred to as the "termination era," Congress "endeavored to terminate [the federal government's] supervisory responsibilities for Indian tribes." South Carolina v. Catawba Indian Tribe, Inc., 476 U.S. 498, 503 (1986). Consistent with that policy, on August 27, 1954, Congress enacted the Ute Partition and Termination Act (UPA), 25 U.S.C. §§ 677 et seq. The express purpose of the UPA was "to provide for the partition and distribution of the assets of the Ute Indian Tribe [(Tribe)] of the Uintah and Ouray Reservation [(Reservation)] in Utah between the mixed-blood and full-blood members thereof; for the termination of Federal supervision over the trust, and restricted property, of the mixed-blood members of said tribe; and for a development program for the full-blood members thereof, to assist them in preparing for termination of Federal supervision over their property." 25 U.S.C. § 677. At the time of the UPA's enactment, the Tribe owned "cash, accounts receivable, and land" estimated to be worth $20,702,885, as well as "additional assets consisting of oil, gas, and mineral rights (principally oil shale deposits underlying the reservation), and unadjudicated and unliquidated claims against the United States." Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 134 (1972).

Implementation of the UPA began with the preparation and submission, by

3

the Tribe, of "roll[s] of [its] full-blood" and "mixed-blood members . . . [that were] living on August 27, 1954." 25 U.S.C. § 677g. Those membership rolls were finalized and published on April 5, 1956. 21 Fed. Reg. 2208-20 (Apr. 5, 1956). "The rolls listed 490 mixed-bloods and 1,314 full-bloods, a total of 1,804. The ratio was 27.16186% mixed-bloods and 72.83314% full-bloods." Affiliated Ute Citizens, 406 U.S. at 135 n.5. The UPA provided that, "[e]ffective on the date of publication of the[se] final rolls," membership in the Tribe "consist[ed] exclusively of full-blood members," and "[m]ixed-blood members" were deemed to "have no interest [in the Tribe] except as otherwise provided" in the UPA. 25 U.S.C. § 677d.

The next step in the implementation of the UPA was the "division of the assets of the [T]ribe that [we]re then susceptible to equitable and practicable distribution." 25 U.S.C. § 677i.[2] This step was to be carried out by "[t]he [T]ribal [B]usiness [C]ommittee representing the full-blood group, and the authorized representatives of the mixed-blood group . . . ." Id. Pursuant to authority granted by the UPA, the mixed-bloods created an unincorporated association, Affiliated Ute Citizens of the State of Utah (AUC), to act as their

_____

[2] Section 677i also provided that "[a]ll unadjudicated or unliquidated claims against the United States, all gas, oil, and mineral rights of every kind, and all other assets not susceptible to equitable and practicable distribution [were to] be managed jointly by the Tribal Business Committee and the authorized representatives of the mixed-blood group, subject to such supervision by the Secretary as [wa]s otherwise required by law," for the benefit of both the full-bloods and the mixed-bloods. 25 U.S.C. § 677i.

4

authorized representative. 25 U.S.C. § 677e; App. at 130. In October 1956, the AUC and the Tribal Business Committee agreed upon a "Plan for Division of Assets" (Plan for Division). App. at 127-141.

Section X of the Plan for Division, entitled "Land," provided for the division of the Tribe's land. Id. at 133-135. It identified five categories of land (i.e., "Land Unsatisfactory for Division," "Assigned Lands," "Range Lands," "Timber Land," and "Other Lands") and made specific provision for each. Subsection F thereof, entitled "Water Rights," provided as follows:

> All water and water rights pertinent to the lands involved or generally used in connection therewith whether represented by shares of stock in a corporation or otherwise and all potential water rights that may subsequently attach to the lands to be divided shall be considered in arriving at the fair value of the lands divided and shall be considered as running with the lands.

Id. at 135 (emphasis in original).

In November 1956, the Secretary, through the Acting Commissioner of the Bureau of Indian Affairs, approved, with minor changes, the Plan for Division. Id. at 142-44. In doing so, the Secretary made the following recommendation to the Tribal Business Committee and the AUC's Board of Directors:

> [W]e recommend to you, in fact urge you, to give serious consideration to the obtaining of unimpeachable qualified independent advice in the matter of review of proposed plans for division of the lands falling within [the "Other Lands"] classification, and such similar review as you may deem advisable covering your entire real estate partition.

Id. at 143. In late 1957 and early 1958, the Tribal Business Committee, AUC's

5

Board of Directors, and AUC membership adopted resolutions approving the Plan of Division. Id. at 1162-1179. The resolutions adopted by the AUC board and membership confirmed that the division of assets outlined in the Plan of Division was "satisfactory, equitable, practicable and based upon the relative number of persons comprising the final membership roll of each group." Id. at 1169, 1174-75. On March 24, 1958, the Commissioner of Indian Affairs, acting on behalf of the Secretary, approved the division of assets, finding that it was "made in a manner equitable to the two groups and within the legal authority of the" UPA. Id. at 1209.

Following the adoption and approval of the Plan for Division, the mixed-bloods, as required by the UPA, 25 U.S.C. § 677*l*, prepared and ratified a Plan for Distribution of the mixed-bloods' assets among the members of the mixed-blood group. Id. at 147. In accordance with the Plan for Distribution and the UPA, the mixed-bloods in turn formed three corporations to manage their assets. Two of those were non-profit grazing corporations (Range Corporations) created to manage approximately 172,000 acres of former tribal range lands that, pursuant to the Plan for Division, belonged exclusively to the mixed-bloods. Each mixed-blood member surrendered his or her individual interest in the range lands in return for stock in the Range Corporations (which shares could, in the discretion of each member, be leased or sold). Id. at 161. Fee patents were then issued conveying to the Range Corporations all of the range lands, as well as "all the

6

rights, privileges, immunities, and appurtenances, of whatsoever nature," that were connected therewith.[3]  Id. at 1261-74.  The only exceptions to these conveyances were "all minerals and mineral rights, including oil and gas," which were "reserved to the . . . Tribe . . . and the [AUC] . . . ."  Id.

The third corporation created by the mixed-bloods in connection with the Plan for Distribution was the UDC.  Id. at 652.  UDC was created to

> manage jointly with the Tribal Business Committee . . . all unadjudicated or unliquidated claims against the United States, all gas, oil, and mineral rights of every kind, and all other assets susceptible to equitable and practicable distribution to which the mixed-blood members of said tribe . . . [were then], or m[ight] thereafter become entitled . . . and to receive the proceeds therefrom and to distribute the same to the stockholders of [UDC] . . . .

Id. at 654 (UDC Articles of Incorporation).

Shortly after the Plan for Distribution received final approval, the Tribe and AUC jointly hired an engineering consultant named E. L. Decker to study and produce a report regarding the water rights on the Reservation.  Id. at 2724.  In doing so, both the Tribe and the AUC acknowledged that "before a distribution of lands and assignment of lands c[ould] be fully completed many irrigation problems ha[d] to be solved . . . ."  Id.  Decker completed his report on December 12, 1960.  The report identified all practicably irrigable acreage within the

---

[3] By May of 1963, the Tribe "had purchased all but 48 [R]ange [C]orporation units . . . ."  Hackford v. First Sec. Bank of Utah, 521 F. Supp. 541, 548 (D. Utah 1981).  The Range Corporations "were eventually dissolved and the 39 mixed-bloods whose shares had not been sold to the tribe received individual interests in grazing land."  Id.

Reservation, and in turn used this as the basis for quantifying the tribal reserved water rights.

On August 26, 1961, the Secretary issued a proclamation finalizing the termination of the mixed-blood group from the Tribe. The proclamation stated, in pertinent part, "that effective midnight August 27, 1961," mixed-blood members of the Tribe would "not be entitled to any of the services performed for Indians because of [their] status as . . . Indian[s]," and "[a]ll statutes of the United States which affect Indians because of their status as Indians [would] no longer be applicable to [mixed-bloods] . . . , and the laws of the several States shall apply to [mixed-bloods] in the same manner as they apply to other citizens within their jurisdiction." Id. at 1432 (26 Fed. Reg. 8042 (Aug. 24, 1961)).

On March 14, 1969, AUC filed suit in what was then known as the United States Court of Claims alleging generally "that the Federal Government failed to divide the . . . Tribe's assets properly pursuant to the [UPA], and that they received less than that to which they were entitled." Affiliated Ute Citizens of Utah v. United States, 199 Ct. Cl. 1004 (Ct. Cl. 1972). AUC's petition alleged, in particular, that the UPA "expressly required the United States to convey to the individual 'mixed-blood' members their share of [the Tribe's] water rights," but that those members "ha[d] not been granted, either directly or indirectly, their undivided 27.16186% of said water and water rights, nor any water or water rights whatsoever . . . ." App. at 2767.

8

On October 28, 1977, after eight years of litigation, the Court of Claims

issued a final decision granting summary judgment in favor of the United States.

Affiliated Ute Citizens of Utah v. United States, No. 156-69, 1997 WL 25897 (Ct.

Cl. Oct. 28, 1977). In doing so, the Court of Claims stated:

> We find nothing in the record to shake our conviction that any acts for which the Federal Government might have been liable occurred by 1961, leaving plaintiffs' 1969 filing untimely. The purpose of the termination act was to end the tribal status of mixed-blood Utes and to convert their status to that of ordinary American citizens. The division and distribution of assets of which plaintiffs complain were effected by 1961, all intangible assets being conveyed either in the form of shares in the Ute Distribution Corporation or as appurtenant to land; whatever claims plaintiffs may have had matured then and became barred by the statute of limitations in 1967. Plaintiffs contend that their rights matured in 1966, when the range corporations were dissolved and certain of their assets were acquired by the tribe. But, whatever rights the mixed-bloods took were fixed in 1961, after which the Federal Government took no actions affecting the parties' division of assets. The later payment of money by the Government to the Ute Distribution Corporation does not affect this conclusion, since the relative shares of that corporation were finally fixed by 1961. Neither do we find merit to plaintiffs' contention that they did not know and could not have known that all assets were being divided by the termination procedures. Defendant's numerous citations to the statute, to pre-termination correspondence, and to the plans for division and distribution, leave us no doubt that the mixed-bloods had notice of the finality of the termination procedures. In short, plaintiffs have pointed to no evidence, and we can find none ourselves, establishing a continued federal responsibility for claimed assets of the mixed-bloods beyond the time of the termination proclamation.

Id., 1997 WL 25897 at *1.

*Procedural background*

On April 24, 1995, UDC filed the instant action against the Secretary and

9

the Tribe seeking a declaration of "the parties' rights and obligations under the" UPA. App. at 57. UDC alleged that "[t]he Plan for Division . . . did not provide for an equitable and practicable distribution of water rights, with the possible exception of rights of use of water which were then being beneficially used on the lands distributed," and "did not and could not fully address tribal water rights, because the nature and extent of tribal water rights was unknown." Id. at 62. UDC further alleged that, "[a]t the time of distribution, tribal water rights were not adjudicated, liquidated, defined or quantified, and they remained under the trust responsibility of the United States in accordance with the" UPA. Id. Continuing, UDC alleged that "[f]rom time to time since the passage of the [UPA], the UDC and its agents ha[d] asserted mixed-blood rights to water on the Ute Reservation and ha[d] been informed . . . that the Secretary d[id] not acknowledge such rights." Id. at 67. Based upon these allegations, UDC sought a declaration "that certain water rights were not partitioned; that they remain in trust for the benefit of mixed-blood and full-blood members of the Tribe; and that they are subject to joint management by the [UDC] and the Tribal Business Committee under the supervision of the Secretary . . . ." Id. at 69-70.

The Tribe and the Secretary each moved to dismiss the action arguing, in pertinent part, that UDC's claims were time-barred. On July 26, 1996, the district

10

court denied the Tribe's motion[4], stating, in pertinent part:

> [T]here is no single, discrete event associated with the UPA that has given rise to a cause of action and triggered any attendant limitations period foreclosing this action . . . . [I]f this court were to conclude that certain tribal water rights were not partitioned and are an indivisible asset, then the Ute Tribe and the Secretary of the Interior would each be found to have an ongoing duty to ensure the UDC was properly included at all times in the joint management of that asset. Thus, any breach at any time of the continuing responsibility of the Secretary or the Tribe could trigger a cause of action; hence, a declaratory judgment defining a party's rights under the UPA may properly be sought at any time while the federally supervised joint management scheme is in effect.

Ute Distr. Corp. v. Sec'y of Interior, 934 F. Supp. 1302, 1313 (D. Utah 1996).[5]

On March 5, 1997, the district court remanded UDC's claims to the Secretary "for final action and decision," and "retain[ed] jurisdiction of th[e] matter pending final decision by the" Secretary. App. at 50. On remand, the Secretary, after reviewing the parties' supplemental submissions, issued a twenty-two page letter "conclud[ing] that the tribal water rights of the Ute Indian Tribe were an asset susceptible to equitable and practical distribution and that this asset

---

[4] Although the district court ruled on the Tribe's motion to dismiss, there is no indication in the record on appeal that the district court ever ruled on the Secretary's motion to dismiss.

[5] The Tribe appealed a separate portion of the district court's order "ruling that the Tribe's immunity was waived by provisions of the" UPA. Ute Distrib. Corp. v. Ute Indian Tribe, 149 F.3d 1260, 1261 (10th Cir. 1998). On July 29, 1998, this court reversed that ruling and remanded the matter to the district court "to determine whether the tribal corporate entity [wa]s both a named and proper defendant in this case." Id. at 1269. That issue was rendered moot shortly thereafter when the Tribe moved and was allowed by the district court to intervene as a matter of right, and alternatively by permission.

11

was in fact divided and distributed." Id. at 1370.

Upon return to the district court, UDC challenged the Secretary's decision, in pertinent part, on the grounds that "the Bureau of Indian Affairs . . . failed to provide the UDC access to various documents that the UDC believed would affect the outcome of the 1998 decision." Id. at 1311. On March 24, 2001, the district court again remanded the case for further proceedings before the Secretary. Id. at 1578.

On February 3, 2004, the Secretary issued a second decision (the 2004 Decision) concluding that "UDC failed to provide any evidence or argument which warrant[ed] changing the rationale or conclusions of the 1998 Decision." Id. at 1312. In particular, the Secretary rejected UDC's argument that the Tribe's unquantified Winters[6] water rights were water rights "claims" not susceptible of division, and instead concluded that such water rights were vested rights, established when the reservation was created, and that they were capable of being partitioned in a reasonable manner based on the division and distribution of the reservation's lands. The Secretary further concluded that the documents in the

_____

[6] The term "Winters water rights" derives from the case of Winters v. United States, 207 U.S. 564 (1908). Such rights "are federally created and spring from the act of reserving lands for a particular purpose, such as transforming nomadic Indians into productive agrarians or promoting Indian self-sufficiency." Hackford v. Babbitt, 14 F.3d 1457, 1461 n.3 (10th Cir. 1994). Thus, such rights "have a priority date as of the date of establishment of the reservation . . . ." Id. Further, such rights, "[u]nlike most other water rights, . . . are neither created by use nor lost by nonuse." Id.

12

administrative record "clearly show[ed] that Tribal water rights and water rights claims were susceptible to equitable and practicable distribution under the UPA and in fact were so divided and distributed pursuant to the UPA." Id. at 1326.

The matter again returned to the district court. UDC amended its complaint to add claims challenging the Secretary's 2004 Decision. The Tribe and the Secretary responded, in part, by filing a joint pleading reasserting that UDC's action was time-barred. District Court Docket #272 at 9-11.

On June 2, 2008, the district court issued a memorandum decision affirming the Secretary's 2004 Decision. In doing so, the district court concluded that the tribal reserved water rights were both an asset susceptible to equitable and practicable distribution in 1961 and were in fact divided pursuant to the UPA. The district court also, in the final section of its memorandum opinion and decision, rejected the defendants' statute of limitations arguments, concluding that the earlier denial of the Tribe's motion to dismiss represented the law of the case.[7] Supp. App. at 76-77. On June 3, 2008, the district court entered judgment

_____

[7] Due to the length of time that elapsed between the filing of UDC's original complaint and the ultimate resolution of the case in district court, the district judge who issued the June 2, 2008 memorandum opinion and decision was different than the one who initially ruled on the Tribe's motion to dismiss in 1996. The second judge expressly stated that he found the defendants' statute of limitations argument "compelling," Supp. App. at 76, but nevertheless concluded he was bound, under the law of the case doctrine, by the first judge's ruling. Id. at 77.

We need not decide whether the second judge was somehow bound by the first judge's ruling because, in any event, "a district court's adherence to law of

(continued...)

13

in favor of defendants.  On July 22, 2008, the district court entered an amended judgment affirming the Secretary's 1998 and 2004 decisions, and dismissing with prejudice UDC's second amended complaint.

## II

### *Timeliness of UDC's action - 28 U.S.C. § 2401(a)*

Defendants assert, and we agree, that the threshold question we must address is whether the district court erred in denying defendants' motions to dismiss UDC's action as untimely under 28 U.S.C. § 2401(a).  Although UDC asserts that the issue is moot due to defendants' failure to file a cross-appeal challenging the district court's rulings, UDC is mistaken.  An appellee may, without filing a cross-appeal, "'urge in support of a decree any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court,' but may not 'attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary.'"  El Paso Natural Gas v. Neztsosie, 526 U.S. 473, 479 (1999) (quoting United States v. Am. Ry. Express Co., 265 U.S. 425, 435 (1924)); see 15A Charles Alan Wright, Arthur

_____

[7](...continued)
the case cannot insulate an issue from appellate review . . . ."  Christianson v. Colt Indus. Operating Corp., 486 U.S. 800, 817 (1998).  In other words, as there has been no prior ruling by this court or the Supreme Court in this case regarding the statute of limitations issue, we are not bound by any restriction that the law of the case doctrine may impose.  See United States v. Monsisvais, 946 F.2d 114, 115-16 (10th Cir. 1991) (explaining the law of the case doctrine; citing Arizona v. California, 460 U.S. 605, 618 (1983)).

R. Miller & Edward H. Cooper, Federal Practice and Procedure §3904, at 199-201 (1992) ("Cross-appeal is unnecessary even with respect to matters that have been put aside by the district court, or matters that have been explicitly rejected by the district court."). Defendants' statute of limitations argument falls within the former category because, although it involves an attack on the district court's reasoning in denying the defendants' motions to dismiss, it is neither intended to enlarge defendants' own rights or lessen the rights of UDC. Instead, defendants' statute of limitations argument merely provides an alternative rationale, based on materials well developed in the record, for affirming the dismissal of UDC's claims for relief. We therefore proceed to review the § 2401(a) issue de novo. UOP v. United States, 99 F.3d 344, 347 (9th Cir. 1996) (holding that § 2401(a) statute of limitations issue "must be reviewed de novo"); see Forest Guardians v. United States Forest Serv., — F.3d —, 2009 WL 2915022, at *4 (10th Cir. Aug. 26, 2009) ("We review de novo the district court's jurisdictional conclusion.").

Section 2401(a) provides, in pertinent part, that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a). Determination of the accrual date of an action is critical for purposes of applying § 2401(a). "A claim against [the] United States first accrues on the date when all events have occurred which fix the liability of the Government and entitle the claimant to institute an action." Izaak Walton League of Am., Inc. v. Kimbell,

15

558 F.3d 751, 759 (8th Cir. 2009) (internal quotation marks and alterations omitted); see Felter v. Kempthorne, 473 F.3d 1255, 1259 (D.C. Cir. 2007) ("Actions usually accrue when they come into existence.") (internal quotation marks and brackets omitted).

UDC argues, as it did below, that its action is necessarily timely because the Secretary had, and continues to have, a continuing duty to properly manage any undistributed assets, including what UDC claims were the undistributed water rights and water rights claims, which it asserts are now held in trust for the mixed-bloods. We reject this argument. UDC's original complaint sought a declaration "that certain water rights were not partitioned; that they remain in trust for the benefit of mixed-blood and full-blood members of the Tribe; and that they are subject to joint management by the [UDC] and the Tribal Business Committee under the supervision of the Secretary . . . ." App. at 69-70. Assuming, for purposes of argument, that this constitutes a valid claim, it does not in any way allege that the Secretary mismanaged assets in his possession or otherwise violated his fiduciary duties to the mixed-bloods. Indeed, this allegation effectively concedes, consistent with the language of the UPA itself, that UDC itself was responsible, together with the Tribal Business Committee, for directly managing any undivided assets. 25 U.S.C. § 677i (providing that "all other assets not susceptible to equitable and practicable distribution [were to] be managed jointly by the Tribal Business Committee and the authorized

16

representatives of the mixed-blood group," i.e., UDC).  Moreover, as noted by the Secretary, "the continuing wrong doctrine 'cannot be employed where the plaintiff's injury is definite and discoverable and nothing prevented plaintiff from coming forward to seek redress.'"  Sec'y Br. at 34 (quoting Tiberi v. Cigna Corp., 89 F.3d 1423, 1431 (10th Cir. 1996) (internal quotation marks omitted)).  Thus, UDC cannot rely on the continuing wrong doctrine to save its action from being dismissed as untimely.  Cf. Catawba Indian Tribe of S.C. v. United States, 982 F.2d 1564, 1572-73 (Fed. Cir. 1993) (rejecting similar continuing duty argument).

The Secretary argues that "UDC's claim regarding the division or lack thereof of tribal water rights came into existence no later than the Secretary's termination of the mixed-bloods in 1961," by which time "the full-blood and mixed-blood groups had agreed which assets were susceptible to division and had developed plans to divide and distribute the assets equitably, and the Secretary had approved the plans."  Sec'y Br. at 31.  Further, the Secretary notes, "numerous actions from 1960 forward put UDC on notice that the United States and the Tribe did not recognize UDC as holding an interest in the Tribe's water and water rights . . . ."  Id. at 32.

We find the Secretary's arguments compelling.  Contrary to the conclusion reached by the district court, there was, indeed, a "single, discrete event associated with the UPA that has given rise to a cause of action and triggered any attendant limitations period foreclosing this action . . . ."  Ute Distr. Corp., 934 F.

17

Supp. at 1313. That event was the Secretary's approval of the Plan of Division. At that point in time, all of the Tribe's assets were either divided between the mixed-bloods and the full-bloods, or retained by the United States on behalf of, and to be jointly managed by, the mixed-bloods and full-bloods. As a result, the mixed-bloods knew or should have known that any claims asserting improper division of those assets would need to be filed within six years of the date of the Secretary's approval of the Plan of Division. Cf. Catawba Indian Tribe, 982 F.2d at 1572-73 ("The breach of the Government's duty would have been evident in the way in which the Government implemented the [Catawba Indian Tribe Division of Assets] Act.").

Moreover, as asserted by the Secretary, numerous events have occurred since the time of the Secretary's approval that establish UDC either knew or should have known of the claim it originally sought to assert in this action. Most notably, in March of 1969, AUC (the mixed-bloods' representative in the UPA's division process) filed suit in the United States Court of Claims alleging that the federal government had failed to properly divide under the UPA the Tribe's assets including, in particular, the Tribe's water rights. In other words, an entity closely aligned with UDC and acting on behalf of the mixed-bloods filed suit alleging a claim similar, if not identical, to the one now asserted by UDC.

Because we conclude that UDC's action was untimely, we AFFIRM the district court's dismissal of UDC's action with prejudice and REMAND only for

18

the district to amend its judgment to reflect this as the sole basis for the judgment.