**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUL 29 1998**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UTE DISTRIBUTION
CORPORATION, a Utah corporation,

Plaintiff-Appellee,

v.

UTE INDIAN TRIBE,

Defendant-Appellant.

No. 96-4194

Appeal from the United States District Court
for the District of Utah
(D.C. No. 95-CV-376-W)

Max D. Wheeler, Snow, Christensen & Martineau, Salt Lake City, Utah, (Camille
N. Johnson, Snow, Christensen & Martineau, Salt Lake City, Utah, with him on
the brief), for Plaintiff-Appellee.

Robert S. Thompson, III, Office of Legal Counsel, Ute Indian Tribe, Fort
Duchesne, Utah, (Sandra Hansen, Office of Legal Counsel, Ute Indian Tribe, Fort
Duchesne, Utah, Tod J. Smith, Whiteing & Smith, Boulder, Colorado, with him
on the brief), for Defendant-Appellant.

Before **BALDOCK, HOLLOWAY,** and **MURPHY,** Circuit Judges.

**MURPHY**, Circuit Judge.

The Ute Indian Tribe ("Tribe") appeals the district court's ruling that the Tribe's immunity was waived by the provisions of the Ute Partition and Termination Act of 1954 ("UPA") in suits concerning certain tribal assets jointly managed by the Tribal Business Committee and the Ute Distribution Corporation ("UDC"). Exercising jurisdiction pursuant to 28 U.S.C. § 1292, this court reverses.

## I. BACKGROUND

The Ute Partition and Termination Act of 1954, 25 U.S.C. §§ 677-677aa, was one of a series of Indian termination statutes enacted during a period in which the federal government pursued a policy of terminating its supervisory responsibilities for Indian tribes. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 133 n.1 (1972); *Hackford v. Babbitt*, 14 F.3d 1457, 1461-62 (10th Cir. 1994); *Ute Distrib. Corp. v. United States*, 938 F.2d 1157, 1159 (10th Cir. 1991).

The termination statutes in general provided for the termination of federal guardianship over certain tribes deemed ready to assimilate into Anglo-society. The statutes terminated the federal trust relationship with the designated tribes and terminated the tribes' and individual tribal members' eligibility for special federal services. In addition, the statutes ended the tribes' coverage under federal

Indian laws and imposed state jurisdiction over the terminated tribes. The termination statutes also typically provided for the division and distribution of tribal land and other assets to individual members of terminated tribes and ended federal restrictions on the alienation of such land. [1] *See generally* Felix S. Cohen, Handbook of Federal Indian Law 170-80, 811-13 (1982); Robert N. Clinton et al., American Indian Law 155-58 (3d ed. 1991).

The UPA focused on the Ute Indian Tribe of the Uintah and Ouray Reservation in Utah. The UPA did not terminate federal supervision over the entire Ute Indian Tribe, but instead divided the Ute Indian Tribe into two groups, "full-blood" members and "mixed-blood" members, [2] and provided for the

---

[1] In all, over 100 tribes and bands were terminated during the 1950s and early 1960s. *See* Robert N. Clinton et al., American Indian Law 158 (3d ed. 1991). The termination policy came under attack in the early 1960s, and Congress has since abandoned the termination policy and has instead generally pursued a policy of protecting and promoting tribal self-determination. *See* Felix S. Cohen, Handbook of Federal Indian Law 180, 811 n.1 (1982); *see also Three Affiliated Tribes of Fort Berthold Reservation v. Wold Eng'g*, 476 U.S. 877, 890 (1986) (noting Congress' goal of promoting tribal self-government); *United States v. Felter*, 546 F. Supp. 1002, 1006 n.5 (D. Utah 1982) ("It is ironic that while the mixed-blood Utes were being terminated from federal supervision in 1961 . . . new directions in Indian policy were being formulated by Congress. Termination as a policy was effectively abandoned by Congress a few years later in favor of tribal self-determination within a continuing federal trusteeship.").

[2] We recognize the terms "mixed-blood" and "full-blood" may be considered offensive. Because the UPA employs these terms, however, we do the same to avoid confusion. *See Affiliated Ute Citizens v. United States*, 406 U.S. 128, 133 n.3 (1972).

termination of federal supervision only as to the mixed-blood members. [3] The

stated purposes of the UPA were to partition and distribute the assets of the Ute

Indian Tribe between the mixed-blood group and full-blood group; to end federal

supervision over the trust and restricted property of the mixed-blood group; and to

create a development program for the full-blood members to assist them in

preparing for later termination of federal supervision over their property. *See* 25

U.S.C. § 677.

The UPA directed that membership rolls be prepared for the full-blood and

mixed-blood groups. *See id.* § 677g. In 1956, the Secretary of Interior published

the final membership rolls listing 1314 full-blood members (approximately 73%)

and 490 mixed-blood members (approximately 27%). *See* 21 Fed. Reg. 2208-12

(Apr. 5, 1956). The UPA provided that, upon publication of the final rolls, the Ute

Indian Tribe was to "consist exclusively of full-blood members" and the mixed-

blood group was to retain "no interest therein except as otherwise provided" in the

UPA. 25 U.S.C. § 677d.

---

[3]Under the UPA, the "full-blood" group was comprised of those individuals with at least "one-half degree of Ute Indian blood and a total of Indian blood in excess of one-half." 25 U.S.C. § 677a(b). The "mixed-blood" group was comprised of those individuals who either did not possess sufficient Indian or Ute Indian blood to qualify as a full-blood tribal member or became a mixed-blood member by choice under provisions of the UPA. *See id.* §§ 677a(c), 677c.

After the final rolls were published, the Tribal Business Committee, representing the full-blood members, and the "authorized representatives" of the mixed-blood members were directed to divide the tribal assets [4] "then susceptible to equitable and practicable distribution" (the "divisible assets"). *Id.* § 677i. The divisible assets were to be divided according to the relative number of persons on the final membership rolls of each group. *See id.* The assets of the mixed-blood group were then to be distributed to the individual mixed-blood Utes. *See id.* § 677 *l.*

The UPA provided for the termination of federal supervision over the assets which were distributed to the individual members of the mixed-blood group. Federal supervision remained, however, over the assets partitioned to the full-blood group. Federal supervision also remained over the "unadjudicated or unliquidated claims against the United States, all gas, oil, and mineral rights of every kind, and all other assets not susceptible to equitable and practicable distribution" (the "indivisible assets"). *Id.* § 677i. These indivisible assets remained in trust for the benefit of both the full-blood and mixed-blood groups and were to be "managed jointly by the Tribal Business Committee and the

---

[4]Tribal assets were defined by the UPA to include "any property of the tribe, real, personal or mixed, whether held by the tribe or by the United States in trust for the tribe." *Id.* § 677a(f).

authorized representatives of the mixed-blood group, subject to such supervision by the Secretary [of Interior] as is otherwise required by law." *Id.*

In 1961, federal guardianship over the mixed-blood Utes was officially terminated by issuance of a proclamation of the Secretary of Interior. *See* 26 Fed. Reg. 8042 (1961); *see also* 25 U.S.C. § 677v (requiring publication of proclamation declaring termination). Once this proclamation was issued, the mixed-blood Utes were no longer "entitled to any of the services performed for Indians because of [their] status as . . . Indian[s]," and all federal statutes "affect[ing] Indians because of their status as Indians [were] no longer . . . applicable to such [terminated Utes]," who were instead subjected to state laws. 25 U.S.C. § 677v. Although the proclamation ended federal supervision over the assets distributed to the mixed-blood group, it did not terminate the trust status of the indivisible assets. *See Affiliated Ute Citizens*, 406 U.S. at 139. [5]

---

[5]The termination of the mixed-blood Utes and the distribution and management of tribal assets under the UPA's provisions has led to extensive litigation. For a more complete discussion of the background of the UPA and a collection of cases involving the UPA, see *Hackford v. Babbitt*, 14 F.3d 1457, 1463-64 (10th Cir. 1994).

## II. DISTRICT COURT OPINION

In 1995, the UDC, the mixed-blood Utes' "authorized representative" for purposes of managing the indivisible assets with the Tribal Business Committee,[6] brought this action seeking a declaratory judgment that certain tribal water rights were not partitioned, that they remain in trust for the benefit of the mixed-blood and full-blood Utes, and that they are subject to joint management by the UDC and the Tribal Business Committee under the supervision of the Secretary of Interior. *See Ute Distrib. Corp. v. Secretary of Interior*, 934 F. Supp. 1302, 1306 (D. Utah 1996). The Tribe responded by filing a motion to dismiss, asserting, among other things, that it is immune from suit and has not waived its immunity by consenting to be sued. *See id.*

The district court held the Tribe was not immune from suit, determining that the UPA limited the Tribe's immunity with respect to the adjudication of issues concerning the joint management of the indivisible assets. *See id.* at 1307. The district court reached this conclusion by determining that although the UPA "lacks any language expressly authorizing a cause of action in federal court, the structure

---

[6]The mixed-blood Utes' "authorized representative," for purposes of the partition and distribution of the divisible tribal assets and the management of the indivisible assets, was initially the Affiliated Ute Citizens of Utah ("AUC"). The AUC delegated the authority to act as the terminated Utes' authorized representative in managing the indivisible assets to the UDC in 1959. *See Affiliated Ute Citizens*, 406 U.S. at 136; *Murdock v. Ute Indian Tribe of Uintah & Ouray Reservation*, 975 F.2d 683, 685 (10th Cir. 1992).

and purpose of the Act clearly divests the Tribe" of its immunity in suits concerning the indivisible tribal assets.    *Id.* at 1309.

In examining the structure and purpose of the UPA, the district court noted that the UPA mandates the joint management of the indivisible tribal assets by the Tribal Business Committee and the UDC under the supervision of the Secretary of Interior and, as to those assets, preserves the federal trust relationship with both the mixed-blood and full-blood members.    *See id.* at 1308-10.  The court therefore determined the indivisible assets are "not under the traditional sovereign control of the Ute Tribe, but are held in trust by the Government for the benefit of both the Tribe and the [UDC], who must jointly share the management responsibilities for the indivisible assets."    *Id.* at 1310.  The court then concluded it would be

> incongruous with the structure and intent of the UPA to conclude that the Ute Indian Tribe may assert sovereign immunity in actions brought to determine the status of, or rights in, assets held in trust by the United States for the benefit of both the Tribe and the mixed-bloods.  Such a result would frustrate the purpose of the Act by effectively allowing the Tribe to exclude the mixed-bloods' representative, the UDC, from participating in the joint management of the indivisible assets, and would clearly run counter to the plain language of the UPA requiring that such assets "shall be managed jointly by the Tribal Business Committee and the [UDC]."

*Id.* (alteration in original) (quoting 25 U.S.C. § 677i).

In support of its ruling that the Tribe was not immune from suit, the district court further concluded that allowing the Tribe to assert immunity "would

contradict the overriding national interest of ensuring that federal trust property is managed in an orderly manner according to the joint scheme set forth by Congress in the UPA." *Id.*

## III. DISCUSSION

The Tribe asserts the district court erred in concluding it was not immune from suit and thus denying its motion to dismiss. The Tribe argues that, given the absence of any language in the UPA expressly authorizing a suit in federal court against the Tribe to enforce the joint management provisions of the UPA, the district court improperly determined the Tribe's immunity from suit was waived by the UPA. The UDC argues the district court properly found that, based on the "plain language" of the joint management provisions of the UPA, the Tribe's immunity from suit was waived for the adjudication of issues concerning the indivisible assets. Alternatively, the UDC contends that the "sue and be sued" provision in the Tribe's corporate charter constitutes an express waiver by the Tribe of its immunity in this case.

This court reviews de novo the legal question of whether a party can assert immunity. *See Fletcher v. United States*, 116 F.3d 1315, 1323-24 (10th Cir. 1997).

### A. Congressional Waiver of Tribal Immunity in the UPA

In *Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978), the Supreme Court established the rule for determining whether a tribe's immunity from suit has been

waived. The Court stated, "Indian tribes have long been recognized as possessing the common-law immunity from suit traditionally enjoyed by sovereign powers." *Id.* at 58. The Court recognized that "[t]his aspect of tribal sovereignty, like all others, is subject to the superior and plenary control of Congress," which may limit or abrogate a tribe's immunity from suit. *Id.* Nevertheless, "[i]t is settled that a waiver of sovereign immunity cannot be implied but must be unequivocally expressed." *Id.* (internal quotations omitted); *see also Kiowa Tribe of Okla. v. Manufacturing Techs., Inc.*, No. 96-1037, 1998 WL 260001, at *6 (U.S. May 26, 1998) (reaffirming doctrine of tribal immunity and stating Congress can alter the limits of tribal immunity through "explicit legislation").[7]

---

[7]As suggested in *Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978), courts have traditionally regarded tribal immunity as an aspect of the tribes' inherent sovereignty. *See id.* at 55-56, 58-59; *see also Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 509 (1991). Courts have also treated tribal immunity as "necessary to preserve the autonomous political existence of the tribes and to preserve tribal assets." *Chemehuevi Indian Tribe v. California State Bd. of Equalization*, 757 F.2d 1047, 1051 (9th Cir. 1985) (citation omitted); *see also Enterprise Management Consultants, Inc. v. Hodel*, 883 F.2d 890, 892 (10th Cir. 1989); *American Indian Agric. Credit Consortium, Inc. v. Standing Rock Sioux Tribe*, 780 F.2d 1374, 1378 (8th Cir. 1985).

Recently, however, in *Kiowa Tribe v. Manufacturing Technologies, Inc.*, No. 96-1037, 1998 WL 260001 (U.S. May 26, 1998), the Supreme Court questioned these traditional bases for tribal immunity. In *Kiowa Tribe*, the Court considered whether the doctrine of tribal immunity barred a suit against a tribe in state court arising from a contract involving off-reservation commercial conduct. *See id.* at *2. The Court examined the early Supreme Court precedent for tribal immunity, concluding that the doctrine of tribal immunity "developed almost by accident" in Supreme Court case law. *Id.* at *4. The Court also stated that "[t]here are reasons to doubt the wisdom of perpetuating the doctrine" of tribal

In *Santa Clara Pueblo*, a female member of an Indian tribe invoked the Indian Civil Rights Act of 1968 ("ICRA"), 25 U.S.C. §§ 1301-1303, to challenge a tribal ordinance denying tribal membership to children of female members who married outside the tribe while extending membership to children of male members who married non-members. *See* 436 U.S. at 51. The threshold issue before the Supreme Court was whether the ICRA authorizes suits for declaratory or equitable relief against a tribe or tribal officer to enforce its substantive provisions. *See id.* at 51-52.

The Court first considered whether an ICRA suit against the tribe was barred by tribal immunity. After setting out the basic rule that any waiver of tribal immunity must be unequivocally expressed, the Court stated: "Nothing on the face of Title I of the ICRA purports to subject tribes to the jurisdiction of the federal courts in civil actions for injunctive or declaratory relief." *Id.* at 59. The only remedial provision expressly supplied in the ICRA is a provision allowing a habeas corpus action to be brought by "any person, in a court of the United States,

immunity, indicating that although tribal immunity may have at one time "been thought necessary to protect nascent tribal governments," "[i]n our interdependent and mobile society . . . tribal immunity extends beyond what is needed to safeguard tribal self-governance." *Id.* at *5. Nevertheless, the Court refused to judicially limit or abrogate tribal immunity, stating that "the doctrine of tribal immunity is settled law and controls this case." *Id.* at *4. The Court further reaffirmed that Congress has always been at liberty to alter or abrogate tribal immunity through "explicit legislation," but until Congress acts, tribes are entitled to immunity from suit. *Id.* at *6.

to test the legality of his detention by order of an Indian tribe." 25 U.S.C. § 1303. The Court noted that, "since the respondent in a habeas corpus action is the individual custodian of the prisoner, the [provision allowing a federal habeas corpus action] can hardly be read as a general waiver of the tribe's sovereign immunity." 436 U.S. at 59 (citation omitted). Therefore, given "the absence . . . of any unequivocal expression of contrary legislative intent," the Court concluded the tribe's sovereign immunity barred suits brought against the tribe to enforce the ICRA's provisions. *Id.*

Like the ICRA, the UPA is devoid of any language clearly expressing an intent to subject the Tribe to lawsuits in federal court over the joint management of the indivisible tribal assets. As the district court recognized, the UPA "lacks any language expressly authorizing a cause of action in federal court [against the Tribe]." *Ute Distrib. Corp.*, 934 F. Supp. at 1309. The UPA contains no references to a waiver or limitation of tribal immunity, nor does the UPA contain any provisions purporting to give the terminated Utes the right to sue the Tribe to enforce the UPA's joint management provisions. *Cf. Fluent v. Salamanca Indian Lease Auth.*, 928 F.2d 542, 546 (2d Cir. 1991) (noting that "[w]hen Congress has chosen to limit or waive the sovereign immunity of Indian tribes, it has done so in clear language" and citing as examples 1958 and 1974 statutes providing that tribes could "commence or defend" actions against each other). Moreover, the

UPA contains no reference to federal court jurisdiction over disputes arising from the management of the indivisible assets. *Cf. Public Serv. Co. v. Shoshone-Bannock Tribes*, 30 F.3d 1203, 1206-07 (9th Cir. 1994) (holding Hazardous Materials Transportation Act abrogates tribes' immunity in federal court for preemption suits because statute's language expressly provides that tribes, like states, are subject to preemption rules, including the provision that allows preemption suits to be brought in "any court of competent jurisdiction"); *Northern States Power Co. v. Prairie Island Mdewakanton Sioux Indian Community*, 991 F.2d 458, 462-63 (8th Cir. 1993) (same).

Despite the absence of any provision in the UPA expressly subjecting the Tribe to suit, the UDC asserts this court should find a waiver of immunity by implication to avoid undermining the purposes of § 677i of the UPA. The UDC argues that such a waiver is consistent with the UPA's provisions and necessary to ensure the Tribe's compliance with the joint management scheme set out in the UPA. The UDC also argues that tribal immunity in this case frustrates overriding national interests in the orderly management of the indivisible assets held in trust by the federal government pursuant to the UPA. None of the UDC's arguments, however, allow this court to find a waiver of tribal immunity in the absence of clear congressional abrogation of that immunity.

**1. Limits on Tribe's Sovereign Powers in UPA**

-13-

The UDC first asserts that the joint management provisions of the UPA limit the sovereign powers of the Tribe because the Tribe lacks authority to take "unfettered, unilateral action with respect to [the indivisible] assets." The UDC then suggests that because the Tribe's sovereign powers have been limited by the UPA, the Tribe's immunity has likewise been restricted.

This court considered a similar argument in *Nero v. Cherokee Nation*, 892 F.2d 1457 (10th Cir. 1989). In *Nero*, the plaintiffs asserted that certain treaty language which limited the Cherokee Nation's sovereignty concomitantly limited the tribe's immunity. *See id.* at 1459. The court rejected the argument as inconsistent with the reasoning and holding of the Supreme Court in *Santa Clara Pueblo*. The court stated that in *Santa Clara Pueblo*, the Supreme Court

> adhered to the traditional doctrine of sovereign immunity
> even though the ICRA imposes substantive constraints
> on tribes. The underlying premise of the Court's ruling
> is that a tribe acting in derogation of the ICRA, and thus
> arguably beyond the scope of its sovereign powers, is
> nonetheless immune from suit absent a waiver of
> sovereign immunity. The Court implicitly refused to
> find a waiver arising solely from the alleged violation of
> the ICRA, requiring instead that an explicit waiver be
> found in some other source.

*Id.* at 1461. The court then concluded that "[l]ike the provisions of the ICRA at issue in *Santa Clara Pueblo*, [the treaty provision relied on by the plaintiffs] only places substantive constraints on the Tribe, it does not waive the Tribe's immunity from a suit alleging noncompliance with these constraints." *Id.*

-14-

Likewise, even though the UPA places limits on the Tribe's control over the indivisible assets, this does not itself constitute the requisite clearly expressed waiver of the Tribe's immunity from suits involving disputes over the assets.

## 2. Waiver Based on Purpose and Structure of UPA

The UDC next asserts, and the district court agreed, that although there is no language in the UPA expressly abrogating tribal immunity, a waiver of immunity is necessarily implied by the joint management provisions and the purpose of the UPA. Even assuming, as the UDC argues, the Tribe's assertion of immunity undermines the UPA's scheme for the joint management of the indivisible assets, [8]

_____

[8]In arguing the Tribe's assertion of immunity undermines the purpose of the UPA, the UDC contends that if the Tribe is allowed to assert immunity from suit in federal court, the Tribe will be able to avoid complying with the joint management requirements of the UPA. The UDC asserts that unless it is able to bring a suit in federal court against the Tribe, it will be without a remedy should the Tribe attempt to exclude the UDC from participating in the joint management of the indivisible assets and attempt to exercise unilateral control over the assets. In response, the Tribe asserts that the UDC has other remedies available—including administrative remedies—for enforcing the Tribe's obligation to jointly manage with the UDC the indivisible assets. The Tribe states that "the [Secretary of Interior's] continuing trust obligation [over the indivisible assets] provides the joint managers with legal remedies to address claims pertaining to the management of the indivisible assets."

While not expressly stated, implicit in the UDC's assertions is the argument that the Tribe's immunity must be waived because the UDC is otherwise left without a judicial remedy. The proposition that tribal immunity is waived if a party is otherwise left without a judicial remedy is inconsistent with the reasoning of *Santa Clara Pueblo*. In *Santa Clara Pueblo*, the Court considered whether a suit could be brought under the ICRA against either tribal officers or the tribe. In

this court must still reject the UDC's argument.  Finding a waiver of tribal

immunity based on the purpose of the UPA, rather than an unequivocal expression

<hr />

addressing whether the ICRA allows a federal cause of action against *tribal officers*, who are not protected by tribal immunity, the Court considered the availability of tribal forums to resolve disputes under the ICRA.  *See* 436 U.S. at 65-66.  In determining whether the *tribe* could be sued for violations of the ICRA, however, the Court did not consider such factors as the availability or absence of an alternate forum, but instead required an unequivocal expression of congressional intent to waive the tribe's immunity.  *See id.* at 58-59; *see also Fluent v. Salamanca Indian Lease Auth.*, 928 F.2d 542, 547 (2d Cir. 1991) (rejecting contention that tribal immunity does not bar federal jurisdiction when no other forum is available for the resolution of claims); *Makah Indian Tribe v. Verity*, 910 F.2d 555, 560 (9th Cir. 1990) ("Sovereign immunity may leave a party with no forum for [that party's] claims.").  *But cf. Dry Creek Lodge, Inc. v. Arapahoe & Shoshone Tribes*, 623 F.2d 682, 685 (10th Cir. 1980) (creating limited exception to tribal immunity in ICRA cases when the dispute does not concern internal tribal issues, the plaintiff is a non-Indian, and tribal remedies are unavailable); *see White v. Pueblo of San Juan*, 728 F.2d 1307, 1312 (10th Cir. 1984) (recognizing "*Dry Creek* opinion must be regarded as requiring narrow interpretation in order to not come into conflict with the decision of the Supreme Court in *Santa Clara*"); *Enterprise Management Consultants, Inc. v. United States ex rel. Hodel*, 883 F.2d 890, 892 (10th Cir. 1989) (stating *Dry Creek* exception, "arising from highly unusual circumstances," "must be narrowly construed"); *Nero v. Cherokee Nation*, 892 F.2d 1457, 1460 n.5 (10th Cir. 1989) ("It is . . . clear that tribal sovereign immunity may preclude federal court jurisdiction over non-Indian complaints brought under the ICRA even if tribal remedies are unavailable.").

　　　　Even assuming the lack of a judicial forum to resolve disputes is part of the equation for determining when tribal immunity is waived, however, the UDC has not demonstrated that its rights under the UPA are not adequately protected under 25 U.S.C. §§ 677i and 677aa.  *See* 25 U.S.C. § 677i (providing that indivisible assets would be jointly managed subject to the "supervision [of] the Secretary [of Interior] as is otherwise required by law"); *id.* § 677aa ("Whenever any action pursuant to the provisions of this subchapter requires the agreement of the mixed-blood and full-blood groups and such agreement cannot be reached, the Secretary [of Interior] is authorized to proceed in any manner deemed by him to be in the best interests of both groups.").

of intent to waive immunity, is inconsistent with both the language and the analysis of the Supreme Court in *Santa Clara Pueblo*.

In *Santa Clara Pueblo*, the Court focused on the face of the statute at issue to determine whether Congress had unequivocally expressed an intent to waive tribal immunity. *See* 436 U.S. at 59. The Court did not attempt to glean some congressional intent to waive immunity based on an examination of the structure or purpose of the statute. Given the absence of an unequivocal expression of congressional intent to waive immunity, the Court ruled that the tribe was immune from suit. In so holding, the Court rejected the argument, much like that advanced by the UDC, that because the ICRA was "'designed to provide protection against tribal authority, the intention of Congress to allow suits against the tribe was an essential aspect [of the ICRA]. Otherwise, it would constitute a mere unenforceable declaration of principles.'" *Id.* at 55 (alteration in original) (quoting *Martinez v. Santa Clara Pueblo*, 540 F.2d 1039, 1042 (10th Cir. 1976)). Similarly, this court may not infer congressional intent to waive tribal immunity whether based on a determination that immunity is inconsistent with the purpose of the UPA or a determination that allowing the UDC to bring a suit against the Tribe in federal court would ensure the Tribe's compliance with the UPA's provisions.

**3. Unique Context of UPA**

The UDC further argues that this court should find a waiver of the Tribe's immunity based on the "unique context" of the UPA. The UDC asserts that the cases relied on by the Tribe in which courts have affirmed tribal immunity in the absence of an unambiguously expressed waiver are fundamentally distinguishable from this case. The UDC further asserts, without providing any support, that "the determination of whether an Indian tribe enjoys sovereign immunity from suit depends upon the precise factual and legal milieu in which sovereign immunity is asserted."

Contrary to the UDC's assertions, the requirement that a waiver of tribal immunity be "clear" and "unequivocally expressed" is not a requirement that may be flexibly applied or even disregarded based on the parties or the specific facts involved. *Cf. Chemehuevi Indian Tribe v. California State Bd. of Equalization*, 757 F.2d 1047, 1052 n.6 (9th Cir. 1985) ("[S]overeign immunity is not a discretionary doctrine that may be applied as a remedy depending upon the equities of a given situation."). In the absence of a clearly expressed waiver by either the tribe or Congress, the Supreme Court has refused to find a waiver of tribal immunity based on policy concerns, perceived inequities arising from the assertion of immunity, or the unique context of a case. *See Kiowa Tribe*, 1998 WL 260001, at *5 (refusing to limit tribe's immunity, despite expressing doubt as to necessity or wisdom of continuing doctrine of tribal immunity to protect tribal

-18-

self-governance and despite recognizing that tribal immunity, in economic context, "can harm those who are unaware that they are dealing with a tribe, who do not know of tribal immunity, or who have no choice in the matter, as in the case of tort victims"); *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe*, 498 U.S. 505, 909-10 (1991) (reaffirming that while state may tax cigarette sales by tribe's store to nonmembers, tribe enjoys immunity from suit by state to collect unpaid taxes, thereby rejecting argument that tribal immunity should be abandoned or narrowed because immunity impermissibly burdens the administration of state tax laws and because tribal businesses have become so far removed from traditional tribal interests that immunity "no longer makes sense in this context"); *see also Santa Clara Pueblo*, 436 U.S. at 58, 64 (refusing to find waiver of tribal immunity or creation of federal cause of action against tribal officer, despite recognizing that allowing a federal suit would be useful in securing compliance with substantive provisions of the ICRA).

## 4. Overriding National Interests

The UDC also argues that allowing the Tribe to assert immunity in an action such as this would contradict the overriding "national interest in seeing that the property over which the Secretary of the Interior has trust responsibility [i.e., the indivisible assets] is managed according to the scheme set forth by Congress in the [UPA]."

In *Washington v. Confederated Tribes of Colville Indian Reservation*

(hereinafter " *Colville* "), 447 U.S. 134 (1980), the Supreme Court stated:

> This Court has found . . . a divestiture [of tribal powers] in cases where the exercise of tribal sovereignty would be inconsistent with the overriding interests of the National Government, as when the tribes seek to engage in foreign relations, alienate their lands to non-Indians without federal consent, or prosecute non-Indians in tribal courts which do not accord the full protections of the Bill of Rights.

*Id.* at 153-54; *see also United States v. Wheeler*, 435 U.S. 313, 326 (1978)

(describing areas in which "implicit divestiture of sovereignty has been held to

have occurred"). Relying on *Colville*, the district court stated that "to allow the

Ute Tribe to assert sovereign immunity in this action would contradict the

overriding national interest of ensuring that federal trust property is managed in

an orderly manner according to the joint scheme set forth by Congress in the

UPA." *Ute Distrib. Corp.*, 934 F. Supp. at 1310. The UDC argues that, in light

of this alleged overriding national interest, the Tribe's immunity must be divested.

Even assuming the Tribe's assertion of immunity frustrates the federal

government's interest in the orderly management of property held in trust for the

UDC and the Tribe, this interest simply does not rise to the level of an overriding

national interest such as those identified in *Colville* .[9] *Cf. Bank of Okla. v. Muscogee (Creek) Nation* , 972 F.2d 1166, 1169 (10th Cir. 1992).

### B. Waiver of Immunity by Tribe in Corporate Charter

The UDC finally asserts that the "sue and be sued" provision of the Tribe's corporate charter [10] constitutes an express waiver of immunity in this case. The

[9]It is unclear whether a tribe's immunity from suit, in contrast with its ability to affirmatively exercise sovereign powers, may be implicitly divested when inconsistent with some overriding national interest. In *Colville*, the Supreme Court referred to instances in which tribes' sovereignty has been found to be limited because the tribes' exercise of certain sovereign powers was inconsistent with overriding national interests. *See Washington v. Confederated Tribes of Colville Indian Reservation*, 447 U.S. 134, 153-54 (1950). The *Colville* Court did not address whether a tribe's immunity from suit, as opposed to a tribe's affirmative exercise of tribal powers, could be implicitly divested because inconsistent with some overriding federal interest. Nor has the Supreme Court found that a tribe's immunity was implicitly divested in light of some overriding federal interest. *Cf. Richardson v. Mt. Adams Furniture (In re Greene)*, 980 F.2d 590, 596 (9th Cir. 1992) (discussing Supreme Court's "dependent status analysis," which applies when a tribe is affirmatively asserting its sovereignty in dealing with its property or with non-tribal members, and noting that this analysis has not been applied by Supreme Court to issues of tribal immunity). Because we conclude there is no overriding national interest here rising to the level of the interests described in *Colville*, however, we need not decide whether the balancing test referred to in *Colville* can be applied to implicitly divest a tribe of its immunity from suit.

[10]The Tribe was chartered as a federal corporation in 1938, pursuant to section 17 of the Indian Reorganization Act ("IRA"), 25 U.S.C. § 477. The Tribe had previously adopted a constitution and bylaws, pursuant to section 16 of the IRA, 25 U.S.C. § 476. The Tribe's corporate charter provides, in relevant part:

> 5. The Tribe, subject to any restrictions contained in the Constitution and laws of the United States, or in the Constitution and By-laws of the Tribe, shall have the following corporate powers, in addition to all powers already conferred or guaranteed by the tribal constitution

UDC states that this provision constitutes a waiver of immunity when the Tribe is sued in its corporate capacity and asserts, without any citation, that "[i]n this action, UDC sues the Tribe, as a federally chartered corporation." In response, the Tribe asserts it has never undertaken to act as a federally chartered corporation with respect to the UPA or the indivisible tribal assets and argues that the Tribe's "[s]ection 17 corporation, to the extent it exists, has absolutely no relationship to any aspect of the UPA." The Tribe further asserts there is "no evidence . . . the Tribe pledged or assigned any indivisible tribal assets . . . to a corporation or executed any documents related to this action in its corporate capacity."

Although courts have held that a "sue and be sued" clause in a tribe's corporate charter may constitute a waiver of immunity of the tribal corporation, this waiver is limited to actions involving the corporate activities of the tribe and does not extend to actions of the tribe in its capacity as a political governing body. *See Ramey Constr. Co. v. Apache Tribe of Mescalero Reservation*, 673 F.2d 315, 320 (10th Cir. 1982) (holding that presence of "sue and be sued" provision in

---

and by-laws:
. . . .
(I) To sue and to be sued in courts of competent jurisdiction within the United States; but the grant or exercise of such power to sue and be sued shall not be deemed a consent by the said Tribe or by the United States to the levy of any judgment, lien, or attachment upon the property of the Tribe other than income or chattels specially pledged or assigned.

corporate charter does not affect immunity of tribe as a constitutional entity); *Rosebud Sioux Tribe v. Val-U Constr. Co.*, 50 F.3d 560, 563 (8th Cir. 1995) (holding "sue and be sued" clause in tribe's corporate charter does not operate as a general waiver of the tribe's immunity from suit); *see also Seneca-Cayuga Tribe v. Oklahoma*, 874 F.2d 709, 715 n.9 (10th Cir. 1989) (explaining that the corporate charters authorized by the Indian Reorganization Act "usually include a 'sue and be sued' clause to enable the tribes to engage in commercial activity as corporations without losing their sovereign immunity as tribes").

The district court stated that it was unclear, based on the UDC's Complaint, whether the UDC actually brought suit against the Tribe as a corporate entity rather than as a governmental entity. The court thus concluded that "it is at least facially ambiguous whether the tribal corporate entity is indeed a defendant in this case." *Ute Distrib. Corp.*, 934 F. Supp. at 1310. The district court further recognized that "[w]hether the 'sue and be sued' clause of the charter serves as a waiver of sovereign immunity depends on whether the Ute Tribe as constitutional organization or the Ute Tribe as federal corporation is the proper defendant here." *Id.* The court deferred ruling on this issue, however, stating: "At this stage of the litigation, it is unclear whether the Tribal Business Committee's exercise of its joint management function with respect to the indivisible assets is a corporate activity, or whether the Committee is acting on behalf of the tribal organization."

*Id.* at 1311. Because the district court did not rule on this issue below, this court does not address the UDC's argument that the "sue and be sued" clause operated as a waiver of the Tribe's immunity in this case, but instead remands to the district court to determine whether the tribal corporate entity is both a named and proper defendant in this case.

## IV. CONCLUSION

Because the UPA lacks any unequivocal expression of congressional intent to subject the Tribe to suit in federal court in actions brought by the terminated Utes to enforce the UPA's joint management provisions, the district court erred in concluding that the Tribe's immunity from suit was waived by the UPA. This court **REVERSES** and **REMANDS** for further proceedings consistent with this opinion.